The complainants filed their bill, in which it is stated that they claim a five thousand acre tract of land, by virtue of an entry in John Armstrong's office, No. 535, in the name of Jones Kendrick, made on the 27th day of October, 1783, in these words:
"Jones Kendrick, five thousand acres of land, on the west fork of the second creek above General Greene's land, that empties into Duck River on the south side, beginning near the fork of said creek, and extending up the west fork for complement."
That Elijah Robertson, on the 29th of October, 1783, made three entries in the same office for five thousand acres each, Nos. 1043, 1044, 1045, which are situated in the neighborhood of the entry made by Kendrick; that these entries were surveyed and granted previous to 1791; and that the entry 1044 had been transferred to the defendant, to whom a grant issued in the year 1790 — that Thomas Gill, also, had an entry in the same books, made on the 30th day of October, 1783, for one thousand eight hundred and sixty acres, which also lies in the neighborhood of the complainants' entry. The bill *Page 221 
also alleges, that it ever was the intention of the owners of said entry No. 535, that it should be surveyed in an oblong, twice as long as broad, beginning at the junction of the east and west forks of Fountain Creek, and running the oblong up the west fork — that said entry No. 535 has not yet been surveyed, and that if it be run in an oblong form, as was intended, it will include great part of the land granted to the defendant, by virtue of the entry No. 1044; and that if it were run in a square, it will include a considerable part, though not so much; but if it be surveyed in the latter form, only two of the four complainants will be included within the defendant's grant.
It is also charged that the complainants had applied to the principal surveyor of the district in which the land is situated to survey the entry No. 535 in an oblong, but that the surveyor refused to do so.
The complainants assert that, agreeably to the 38th section of the land law of 1807, and the laws of North Carolina referred to by that section, they are entitled to have their entry surveyed in the above described oblong form; and that, in consequence of the refusal of the surveyor to survey in that manner, they have been prevented from getting a grant, and thus rendered incapable of instituting or defending actions of ejectment; and that said Jones Kendrick has sold part of said oblong to different persons, who are in possession.
The bill further states that, the defendant, taking advantage of these circumstances in the complainants' title, has instituted several actions of ejectment against them; and whether the entry No. 535 be surveyed in a square or oblong, it greatly interferes with the said Dallum's grant, as well as the grant to Gill, and Elijah Robertson's entry No. 1,04.
A plat is exhibited showing the connection of these and other granted lands in the neighborhood. Of ten five thousand acre tracts laid down in this plat, not one is laid down in a square; nor were three others of a less quantity. Copies of nearly all these entries were read, and none of them called to run in a square, or any other particular shape. *Page 222 
The bill prays that Dallum may be enjoined from proceeding in his actions of ejectment until it shall be determined whether a square or oblong is the proper form of surveying the entry under which the complainants claim.
Dallum, in his answer, insists that his entry is special; and that if he had surveyed strictly conformably to it, it would have interfered more with the complainants' claim than it does now; that he has fairly, and without fraud, obtained a legal title, and that the complainants' entry is vague, uncertain and not sufficient to wrest from him his legal title. It is also stated by the answer, that should the complainants' entry be deemed valid, they have no right to have it surveyed in an oblong form, as an intention to do so was not expressed in the entry — that there is no claim in the neighborhood that would have prevented the complainants from running their entry in a square; and that if it were run so, it would interfere in a less degree with other present existing claims than if it is surveyed in an oblong. He also insists that as the complain. ants have not obtained a grant, they have no right to come into equity; and he exhibits his title papers as part of his answer.
To this answer there is a replication, whereupon the cause was set for hearing.
It appeared in evidence that General Greene's land was a place of notoriety at the time the complainants' entry was made — that Fountain Creek is the second creek that falls into Duck River on the south side above that tract of land. The description given by several witnesses of Fountain Creek and its branches is, that in going up from its mouth, at 121 poles, is the mouth of Silver Creek which is about nine miles in length, and at its mouth, about one third of the width of Fountain Creek; and that in the summer it contains not more than one sixth part of the water; that in proceeding up Fountain Creek, Hurricane Creek and Brush Creek empty into it, but their size is much smaller than that of Silver Creek. The next is the two forks, nearly of a size, one now called Globe Creek, and the other, which is *Page 223 
the western fork, is called Fountain Creek. From the mouth to these forks is five miles and one hundred and twenty-five poles. Each of these main forks have many branches, but in going up they diverge from each other; they are nearly equal as to length, size and water, and the fork is about seven miles below the head springs.
The complainants claim to begin at the junction of these two forks; and they exhibit evidence to show that the surveyor refused to survey it in an oblong.
It also appeared in evidence that several entries had been made on the same day on which the entry of Kendrick was made, calling for Fountain Creek by its proper name.
In the discussion of this case at the bar three grounds have been taken by the defendant's counsel
1. The entry is vague.
2. The complainants are not entitled to a survey in an oblong.
3. Supposing both these points with the complainants, they have no ground of equity to come into this Court.
It is contended that the word `fork' may as well apply 10 Silver Creek, Hurricane or Brush Creek, as to the place where the complainants claim their beginning — that any branch of a creek is a fork; and that there being many forks or branches to this creek, the entry is therefore uncertain. It is further urged that several entries were made the same day with the complainants, calling the creek Fountain Creek, and that the complainants were therefore bound to call for the creek by its usual name. The counsel also contend that creeks of small comparative size have obtained the name of forks, as Smith's Fork of Caney Fork, and the north fork of Duck River.
Much has been said respecting the certainty which an entry should contain. The expression frequently *Page 224 
occurs in the books — most frequently in relation to pleadings — but it is equally applicable, and may as often arise in any transaction of life, where ideas are to be communicated. So much certainty is always required as is necessary to answer the purpose in view. Language or writing may be sufficiently certain for one purpose and not for another. Thus Lord Coke, in Co. Litt. 303 a, speaking of certainty, says: "That certainty to a common intent is sufficient in pleas in bar;" and that certainty to a certain intent in every particular is requisite in estoppels.
Chief Justice DeGrey, in delivering the opinion of the twelve judges in the House of Lords, in the case of Rex. v. Horn, Cowp. 682, 688, says the expression in its application has no precise abstract meaning. In 1 Com. Dig. (Kyd's Ed.) 57, 317, we find the expression convenient certainty; and in the same page, the kind of convenience spoken of is explained to be so much as will describe the thing to a common understanding. Not such as would exclude all imaginary intendments. Cowp. 682.
What would be the meaning of this entry in common understanding, or with those acquainted, or who might become acquainted with this creek? It is the second creek above Greene's land (Lytle's Creek being the first). The exemplification of the expression fork by the complainants' counsel is natural. In speaking of a fork of a tree, road or creek, we understand something of an equality in some of the branches. A small branch may acquire the name of a fork; when this is the case, the mind fastens on the name which is always arbitrary, and not on the description of a fork according to common language. Names thus acquired, usually have some adjective which completes their designation.
Besides the expression the fork, denotes in common acceptation, the greatest; and those inferior in kind, are expressed by some addition.
The junction of Globe and Fountain Creek is manifestly the place designed for the beginning of the complainants' entry. In common understanding it would be so considered by those acquainted with the creek. *Page 225 
It has been insisted that certainty is the same here as in Kentucky, nay, that it is the same everywhere; and many cases have been cited from Hardin's Reports respecting certainty in entries. It has already been shown that certainty is not the same thing at all times and on all occasions. The certainty of entries in Kentucky depends on the laws of that country; so certainty here depends on our own laws, and they are in some respects essentially different. Hence arises a difference in the degree of certainty required by the two codes, as will be shown hereafter.
Though the creek had acquired the name of Fountain Creek at the time the entry was made, it can not invalidate this entry; because that does not profess to give notice of the place intended by name but by description. Thus much may be predicated of entries in every country, as well in Kentucky as Tennessee, that the mode of construing the meaning and what shall be considered as notorious is the same, and not that the same degree of notoriety or precision as to boundary or mode of surveying entrys shall be required everywhere.
On this occasion, which it is hoped will be the last, a comparative view will be taken of the laws of Kentucky find of this State respecting entries. And as this view will necessarily comprehend the mode of surveying, both will be considered together.
The Act of 1783, ch, 2, is the law on which most of our land claims rest, particularly in the western part of the State. In order to a full comprehension of this Act a cursory view will be taken of those preceding.
The 5th, 6th and 10th sections of the Act of November, 1777; ch. 1, point out the mode of entering, surveying and settling disputes bycaveat. It is worthy of remark that there was no court of equity, at that time. A caveat was supposed an adequate means of affording redress. The surveyor is directed, on receiving warrants of survey from the entry taker, to survey the entries as soon as may be. It was not contemplated that the owner or proprietor *Page 226 
would have any agency in making the survey; it thence resulted that every entry should be sufficiently notorious to give the surveyor information of the place intended to be surveyed. Both equity and reason would dictate that entries should possess so much certainty as to enable subsequent locators to know by reasonable industry the situation of such entries. The 5th section of the Act directs that every location shall be in writing, setting forth the most remarkable places in and about the land entered, or the lines of other lands if contiguous, each entry to have its proper date and number in order of time. Here the precision respecting entries stops; but when this section is taken in connection with the 10th and other sections, and the 6th section of the Act of 1789, c. 6, respecting the mode of surveying, it is manifest that the Legislature did not design or require as much precision in an entry previous to the Act of 1783 as seems to be contemplated by the laws of Kentucky. There the statute requires that an entry shall be made with such precision that subsequent enterers may know the adjacent vacant residuum. This precision was the more requisite there because surveyors were not confined to any particular form — there they might run to any point of the compass and in any shape. Our laws require the surveyor to run all lands in a square or oblong, not exceeding in length twice its breadth, and to the cardinal points unless bounded by the lines of older claims, in which case the survey may be in any shape to the cardinal points binding on such lines. The laws of this country do not say what degree of precision an entry shall possess. In practice, and agreeably to the decisions of our courts, if an older entry possesses a notorious call as to include a spring, and the surveyor runs it out in a square or oblong including the place called for in any part, such survey will hold against any subsequent interfering entry. It has however been strongly urged that this construction of the la wleaves subsequent enterers in the neighborhood at the mercy of an older entry; as it is uncertain how the land will *Page 227 
be run out; in fact, that all lands in a circle, the centre of which will be the beginning of an entry, and its radius the longest line of an oblong whose lines are in a duplicate ratio, will be endangered. Such hardship and difficulty on the part of subsequent enterers, it is contended, never could have been within the view of the Legislature.
This reasoning is the more specious because it is founded in principles of abstract equity; but when tested by legislative regulations and the existing state of the country when the land-laws were made, it is perceived to be unsound and in practice inapplicable. The precision of entries as contemplated by the laws of Kentucky was found almost universally unattainable in practice. Sees Taylor v. Bodley, Sup. C. U. S. 1812.
The most prominent feature in the land laws of North Carolina, is a sedulous and unremitted care that the oldest enterer should obtain the oldest survey and oldest grant.
It is true, the Act of November, 1777, has no express provision on this head. The Legislature then seemed to think there would not be any disputes except amongst settlers, which was to be determined by caveat. In April, 1779, ch. 6, sec. 6 they first discovered a sense of the inconveniencies arising from the interference of surveys. In October, 1779, ch. 4, sec. 9, the idea again occurs. When the land-laws were revised and amended in 1783, ch. 2, and when regulations were made for entering and surveying throughout the State, the Legislature, in sec. 19, complain that "Whereas many disputes have and may arise front the surveyor giving preference to warrants of a younger date, and not certifying in the return of the survey the date of entry and number of warrant under which the same is surveyed, by means whereof grants have in many instances issued on such returns contrary to the true intent and meaning of the said Act."
The remedy provided is, that entry-takers shall semiannually, on or before the 1st of April and October; deliver to the surveyor the warrants of survey; *Page 228 
they are directed to survey entries in their order of date; to return a list of surveys to the secretary in the same order, and by this list the secretary is to make out grants. See further provisions in the laws of North Carolina, to secure to the oldest enterers the first survey and first grant. Acts 1786, ch. 20; 1787, ch. 23; 1796, ch. 9; Tenn. 1801, ch. 3, sec. 7. In other respects concerning entering and surveying, the Act of 1783 is an exact copy of the Act of 1777. The earliest entries of lands in Kentuckey, as here, are not very precise in their description; to include a certain spot, beginning at some notorious place, lying on some water-course or joining the line of some other claim, and similar descriptions, were common. There as well as here, such was the wild as well as dangerous state of the country, that much greater precision was not practicable.
In this state of things the courts of Kentucky, with the maxim of utres magis valeat quam pereat on the one hand, and the impracticable precision required by their statute on the other, felt themselves constrained to adopt a course by presumption or equity, as to the manner in which these entries of general description should be surveyed; otherwise they would have been lost. For the want of precise description in entries as required by their statute, they were not disposed to say that such entries should be void in toto. As to the mode of their being surveyed, a meaning by presumption was given them so as to make them conform as nearly as possible to the spirit of their Act. For instance, an entry calling to include a certain spot, or beginning at some certain and known place, was directed to be surveyed in a square to the cardinal points and that the spot to be included should be in the centre. So if it is called to lie on a creek, it was made to lie equally on both sides. And by these principles disputes as to patented lands were decided. The precision which was designed by the statute to be in the entry was supplied by presumption or equitable construction of the courts, keeping in view the requisition of their statute. The enterers, no doubt, did not foresee that such a construction *Page 229 
would be given; and by the Supreme Court of the United States, in the case of Taylor Quarles v. Brown, February. 1812, it is called artificial. As surveys in that State could be made to any point of the compass and in any lineal form; and as entries were required to be made with so much certainty that subsequent enterers might know precisely the adjacent vacant residuum, such a construction seemed necessary there, to effectuate, as near as possible, the intention of the Act. The decisions of the courts of that State were not founded on general principles of equity alone, but with a view to the spirit and meaning of their legislative Acts aided by those principles. Hardin's Rep. 472.
Let us now examine the features of our own statutes, and see whether they suggest such a construction of entries as has been adopted in that country.
Our statutes are silent as to the degree of certainty an entry should contain. It is left to be collected from the whole of the land law. The first enterer is to have the first survey and first grant. Express provision is made, that if a second enterer should lose his land by a prior claim, he shall either have his money refunded or take land in another place. The surveyor is to run out lands without the direction or control of the claimants; and the surveyor shall run in a square or oblong (unless c.) to the cardinal points. None of these regulations exist in Kentucky.
The primary intention of an entry with us, was to give the surveyor and subsequent enterers notice where the land was intended to be entered; so that the officer might know where to find the land to be surveyed, and subsequent enterers know how to steer clear of the neighborhood of it and to caveat; it was not expected or intended that it should be so precise as to give notice of its boundaries, as was contemplated in Kentucky, and which was found unattainable in practice.
Where directions are given by the government to the surveyor, in what manner he is to run out lands; when that surveyor is to do this duty as a public *Page 230 
officer, without any directions of the claimant, and consequently acts independently of him; when he is commanded to survey all entries in a square or oblong, in the manner already adverted to; where the law is silent as to the degree of precision in entries; in a country where the officers are commanded to give a preference of survey to the oldest entries, and the secretary to issue grants accordingly; where, in thus running out the land of the older enterer, if a younger one shall thereby lose in whole or in part; the law provides that his purchase-money shall be refunded, or that he may remove to other vacant lands; and when we reflect that the Legislature of North Carolina, when she brought her western lands into market, was sensible that it was an unsettled and dangerous country, and difficult to be explored — with these regulations, and under all these circumstances, we can not suppose they designed a precision in entries, which, in the language of Lord Coke, would be equivalent to certainty in every particular. The certainty as to boundary, contended for by the counsel for the defendant amounts to the definition given by Lord Coke, a species of certainty wisely rejected by the twelve judges of England, in the case of Rex v. Horne. Cow. 682. If permitted, I would define the certainty in an entry contemplated by our land-law, to be such as would be necessary in common understanding for the convenient attainment of the views of the Legislature in the appropriation of land, taking into view at the same time the situation of the country in which the entries were to be made.
An entry should carry on the face of it notice to the common understandings of men acquainted in the neighborhood of it, of some call therein, so that other enterers may know when they are without its sphere; otherwise it would be undefined, and so vague that it might as well be surveyed at one place as another. Until it be rendered certain by grant, equity will always relieve subsequent enterers against such a claim, as well as against an entry surveyed obviously contrary to its meaning. *Page 231 
Suppose the case of a caveat, which was the original remedial process contemplated by the Legislature in the Act of 1777 — was it ever heard that a younger enterer could confine an older one to a square in such a case? No; he would be told that the law authorized the surveyor to run it in an oblong, complying with its calls; that the preferences of surveying was expressly given to the first enterer by law, and that he could not be deprived of it by a younger entry being made in the neighborhood. In such a case it would seem sufficient if the call or calls of the elder entry were complied with, according to common understanding; if to include a particular thing, without specifying in what part of the survey it were good, if included in any part; and so of other cases. Such is the usage from the commencement of the land-law. 2 Mass. Rep. 477; Vin. Abr. Tit. Prec. A court of equity would not require greater certainty, if as much, after the emanation of a grant, that would be required on a caveat. It would give to the elder entry the preference secured to it by law in the survey and grant, and consider things in the same point of view as if the surveyor had done his duty in surveying it first, and afford the same benefit as if the secretary had issued the oldest grant. The principles laid down in Hardin's Reports, 194, respecting the statutory preference to preemptioners would lead to this conclusion.
North Carolina, when bringing her western lands into market, opened an office at Hillsborough for the discharge of her debt incurred during the war of the Revolution, at a time of great scarcity of specie; and as one of the conditions of purchase, in order to encourage speedy sales, expressly declared that the first enterer should have a preference in surveying and obtaining grants. This preference of the first enterer over those of a subsequent date may be the more easily accounted for when we consider the anxiety of the State to discharge a debt of gratitude. The scarcity of specie; an extensive, remote, and then not much esteemed tract of wilderness country; *Page 232 
and their greatest care being to procure purchasers, all combined to produce that regulation. And for the purpose of doing this, the provisions of the Act of 1783, as well as the Act of 1777, seemed well calculated to secure this preference from the embarrassments of subsequent claimants as far as it was practicable. It was conceived, then, that there was more good land than could be sold. If this preference be not founded on the most exact ideas of equality, it is at least admirably calculated to prevent litigation, as experience has shown. Enterers of land were generally citizens of the Atlantic part of the State, and far removed from the wilderness in which the lands were to be appropriated; therefore, a minute description in locating as to the boundary, could not well be expected. If the Legislature had so designed, they certainly would have expressed themselves with that view. It can not be considered as a casual omission. The Legislature were employed, when passing the Act of 1783, in amending the Act of 1777, under which a great many titles had originated. This Act, as to entries, contains also the same language as that of 1777. Had it been discovered from experience that greater precision in entering and surveying was requisite, it surely would have been amended by the Act of 1783. This not being done is evidence of the satisfaction which the practical expositions of the former Act afforded. In further confirmation of this idea, as to the specialty of entries and the mode of surveying, the conduct of our own State is not inapposite. In the Act of 1806, ch. 1, section 10, the precision of entries contemplated by the laws of Kentucky is expressly required; but the Legislature, on further experience, found it inconvenient, and by the Act of 1807, ch. 2, sections 38 and 40, adopted the language of the Acts of 1777 and 1783 in relation to entering and surveying lands. The mode of obtaining titles to lands in Pennsylvania, on warrants, seems to be more analogous to our laws than those of Kentucky or Virginia. In Pennsylvania, on the payment of the consideration to, the State, a warrant issues which contains the location (these locations are in general terms) as adjoining the claim of some other person, *Page 233 
or to include some place. Add Rep. 52, 296, 216, 248, 251, 292, 305. In the case of Hamilton v. M'Culloch, Add, Rep, 272, an entry calling to include the White-Oak Level, adjoining the heirs of McKee, was deemed a special location. The first warrant or location gives the best right; but it is said that a vague, indescriptive warrant is sufficient to affect a subsequent claim. 4 Dal. 288. In none of the reports of cases that have come to hand has it been perceived that any dispute arose respecting the manner in which surveys had been made. Hence, it seems fair to presume that if the surveys conformed to the location, according to common understanding, they were deemed sufficient to give the best right to all land included within them; laws being complied with in other respects.
From the most perfect view I am capable of taking of the acts respecting the appropriation of vacant lands, aided by usage under those laws, I am constrained to be of opinion that the complainants' entry is sufficiently special, and that the proper mode of surveying it is to begin at the junction of Globe and Fountain Creek, and to run west and south, so as to include the five thousand acres called for in the entry, in a square or oblong, up the west fork, now called Fountain Creek; and that the surveyor may so run in every such case where he is not restrained by the lines of older claims or natural boundaries, which do not exist in this case.
In the course of this reasoning it may be easily discerned that the Court can not with propriety make an order on the surveyor to run out the entry in an oblong. The complainants have no right to control him; the entry must be his guide; and as that does not state that it shall be surveyed in an oblong, it would be improper for us to give any directions. Had the surveyor insisted upon running contrary to the calls in the entry, a very different question would have been presented. To enable the surveyor to comply with the North Carolina laws, it is indispensably *Page 234 
necessary that he should act independently of the claimant.
A survey of this entry, either in a square or oblong, will be good in point of law.
The third and last view taken of this case involves an inquiry into the jurisdiction of the Court.
It is said that if the Court should be of opinion that the surveyor did not transgress the bounds of his duty in refusing to survey in an oblong, this Court can not entertain jurisdiction; because, in that case, there was no legal impediment to the complainants' going on to get their survey and grant; and that, therefore, they ought not to be permitted to come into this Court for relief. It does not at present appear that the proprietor of an entry can not come into equity before he gets a grant; nor is it necessary to decide that point in this case. It had been usual for thirty years for the surveyor to conform to the wishes and direction of the claimants. The complainants might well suppose that it was a matter of right "to have their land surveyed in an oblong; and on the refusal of the surveyor to do so, it was natural that they should think of recourse to some court for redress. To say the least of it, the point was involved in doubt. 3 Johns. 590, 605; 2 Caine's C. E. 51; 1 Ves. Jr. 424. But as they were likely to be turned out of possession, and as they certainly had a good right to, some part of the land, whether the entry was surveyed in a square or oblong, this Court has jurisdiction to prevent the defendant from doing so. Jurisdiction as to any part of the controversy draws with it the incidental means for the full effectuation of justice. 1 Hen. Mum. 19; Pre. in Chy. 530; 1 Ves. 476; 2 Ves. 453; 1 Bro. Chy. 57; 2 Bro. Ch. 65; 3 Johns. 604.